**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

UNITED STATES OF AMERICA,

           Plaintiff,

vs.

MARK ALAN STEFFES,

           Defendant.

No. 15-CR-3019-LTS

**REPORT AND RECOMMENDATION
(filed under seal)**

---

### *TABLE OF CONTENTS*

*I.*   *BACKGROUND* ................................................................................2

*II.*   *DISCUSSION* ................................................................................4

    *A.*   *THE FIRST SELL REQUIREMENT* ..........................................................5

    *B.*   *THE SECOND SELL REQUIREMENT* ...................................................... 11

    *C.*   *THE THIRD SELL REQUIREMENT* ....................................................... 17

    *D.*   *THE FOURTH SELL REQUIREMENT* ..................................................... 18

*III.*   *CONCLUSION* ........................................................................... 22

       The Defendant, Mark Steffes, suffers from paranoid schizophrenia. The court determined previously that Steffes is not competent to stand trial and committed Steffes to the custody of the Attorney General for treatment and evaluation for 120 days, in accordance with 18 U.S.C. § 4241(d)(1). Doc. 128. The United States (the government) now moves to extend Steffes's commitment under 18 U.S.C. § 4241(d)(2)(A) and to

involuntarily administer antipsychotic medications to Steffes. Doc. 143. I recommend that the government's motion be **granted**.

## I.    BACKGROUND

On April 14, 2015, state law enforcement officers found Steffes in possession of a handgun after he attempted to purchase a firearm, despite his status as a felon. Ex. Q at 2-3.[1] That same day, he was arrested and detained on state charges. *Id.* On May 21, 2015, a federal grand jury returned an indictment charging Steffes with possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Doc. 2. He remained in state custody until his arrest on the federal charge on May 28, 2015. Doc. 12. The next day, Steffes made his initial appearance in this court (Doc. 6), and the court ordered that Steffes be detained pending trial (Docs. 14, 16).

After Steffes moved for a competency evaluation (Doc. 19), the court ordered him committed to the custody of the Attorney General for thirty days for a mental health evaluation, in accordance with 18 U.S.C. §§ 4241(b) and 4247(b) (Doc. 20). The Bureau of Prisons issued a report on August 26, 2015, opining that Steffes was competent to proceed to trial. Doc. 38-1; Ex. 5. Shortly thereafter, the court held a competency hearing and found Steffes competent. Doc. 38

Steffes's condition deteriorated, and on March 3, 2016, Steffes moved for a second competency evaluation. Doc. 105. The court once again committed Steffes for thirty days so that his mental health could be evaluated. Doc. 112. A psychologist for the Metropolitan Correctional Center in Chicago, where Steffes had been receiving treatment, issued a report on May 3, 2016, deeming Steffes incompetent. Doc. 122; Ex.

---

[1] The defendant's exhibits A through P are located at Doc. 156-1 to Doc. 157. The government's exhibits 1 through 10 are located at Doc. 160 to Doc. 160-9.

2

6. After holding a competency hearing on May 24, 2016 (Doc. 127), the court issued a written opinion finding that Steffes "suffers from a mental disease or defect which . . . render[s] him mentally incompetent to the effect that he is (a) unable to understand the nature and consequences of the proceeding against him, or (b) unable to assist properly in his defense" (Doc. 128). In accordance with 18 U.S.C. § 4241(d), the court committed Steffes to the custody of the Attorney General "for such reasonable period of time, not to exceed 120 days, as is necessary to determine whether there is a substantial probability" of Steffes's competency being restored. Doc. 128. Steffes's treatment began on June 23, 2016, at the U.S. Medical Center for Federal Prisoners in Springfield, Missouri (the Medical Center). Doc. 133.

The government filed the current motion on December 9, 2016, requesting (1) that the defendant be committed for an additional reasonable period of time under 18 U.S.C. § 4241(d)(2)(A); (2) that the court order the involuntary administration of antipsychotic medication to Steffes as part of his treatment; and (3) that the court hold a hearing on the issue of involuntary medication to determine whether the standard set forth in *Sell v. United States*, 539 U.S. 166 (2003), was satisfied. Doc. 143. The government submitted as an exhibit a November 4, 2016, letter from the warden of the Medical Center, requesting additional time for competency restoration, and an attached competency report prepared by Benjamin Laliberte, a doctorate student in clinical psychology interning at the Medical Center. Ex. 1; Ex. 7; Doc. 144. Mr. Laliberte opined that Steffes remained incompetent and that his competency would not likely be restored without antipsychotic medication, which Steffes refused to take voluntarily. Ex. 7 at 12.

The court held a *Sell* hearing on April 13, 2017. Doc. 159. Three witnesses testified on behalf of the government: Mr. Laliberte; Dr. Elizabeth Tyner, a psychologist at the Medical Center and Mr. Laliberte's supervisor; and Dr. Robert Sarrazin, a psychiatrist at the Medical Center. *Id.* In addition, the government submitted, and the

court admitted, ten exhibits into evidence. *Id.* Steffes submitted, and the court admitted, seventeen exhibits, and Steffes was given the opportunity to testify to the court. *Id.* On May 3, 2017, the government submitted a brief arguing in support of involuntary medication (Doc. 168), and Steffes submitted a brief in resistance (Doc. 169).

## II. DISCUSSION

In *Sell*, the Supreme Court held that the government may "administer antipsychotic drugs involuntarily to a mentally ill criminal defendant . . . to render that defendant competent to stand trial for serious, but nonviolent, crimes . . . . in limited circumstances." 539 U.S. at 169. Before authorizing involuntary medication, *Sell* requires the court to find "(1) that an important governmental interest is at stake; (2) that involuntary medication will significantly further that governmental interest; (3) that involuntary medication is necessary to further that interest; and (4) that administration of the drugs is medically appropriate." *United States v. Mackey*, 717 F.3d 569, 573 (8th Cir. 2013) (citing *Sell*, 539 U.S. at 180-81). "[T]he government bears the burden of proving the final three *Sell* factors by clear and convincing evidence." *United States v. Fazio*, 599 F.3d 835, 840 n.2 (8th Cir. 2010).

With regard to the burden of proof for the first *Sell* criterion, the parties agreed with the court at the hearing that the government must prove an important governmental interest by a preponderance of the evidence. Doc. 166 at 3:7-4:14. After further review, I do not believe this is the proper standard. If the first *Sell* requirement is a purely legal question, *see Mackey*, 717 F.3d at 573; then neither party bears the burden of proof, *see Sequa Corp. & Affiliates v. United States*, 350 F. Supp. 2d 447, 449 (S.D.N.Y. 2004) ("[T]he concept of 'burden of proof' has no relevance where a dispute is solely on a question of law."), *aff'd*, 437 F.3d 236 (2d Cir. 2006) (per curiam). If a mixed question of law and fact, *see United States v. Sell*, 282 F.3d 560, 567-68 (8th Cir. 2002), *vacated*,

4

539 U.S. 166; then it seems likely that the government must prove any factual findings by clear and convincing evidence, *see Fazio*, 599 F.3d at 840 n.2 (recognizing that other courts of appeals have held "that the government bears the burden of proof on factual questions [at a *Sell* hearing] by clear and convincing evidence"); *United States v. Watson*, 793 F.3d 416, 420 (4th Cir. 2015) ("[W]e require that the government prove by clear and convincing evidence each of four factors."). I need not resolve this issue, however, as I find that under either standard, the first criterion has been met, as discussed further below.

## A. The First <u>Sell</u> Requirement

The government has an important interest "in bringing to trial an individual accused of a serious crime," but "[s]pecial circumstances may lessen the importance of that interest." *Sell*, 539 U.S. at 180. The parties agree that possession of a firearm by a felon is a serious crime. Docs. 168 at 3, 169 at 3 (citing *Fazio*, 599 F.3d at 840; *Mackey*, 717 F.3d at 573). They dispute whether special circumstances lessen the importance of the government's interest in prosecuting Steffes.

"[T]he proportion of the potential sentence" that the defendant has already served may weaken the government's interest in prosecution. *United States v. Nicklas*, 623 F.3d 1175, 1179 (8th Cir. 2010) (citing *Sell*, 539 U.S. at 180). To determine the potential sentence, the projected sentence under the United States Sentencing Guidelines (Guidelines) "is relevant," but the Eighth Circuit "place[s] greater weight on the statutory maximum." *Id.* at 1179 n.5. The parties agree that Steffes's Guidelines range will likely be somewhere between fifteen and thirty-three months and that he is subject to a statutory maximum of ten years' imprisonment. Doc. 168 at 8 & n.6; Doc. 169 at 3, 6. Steffes has already been detained for twenty-four months pending trial. If restored to competency, by the time Steffes is tried, he will likely have already served the sentence

5

recommended by the Guidelines: Steffes may immediately appeal an order of involuntary medication, which will extend his detention, *Sell*, 539 U.S. at 176-77; and Dr. Sarrazin testified that restoring Steffes's competency would likely take five to seven months (Doc. 166 at 107:6-23). In rebuttal, the government argues that a court could vary upward from the Guidelines range based on an underrepresentation of criminal history or the offense conduct. Doc. 6. By the time Steffes is tried, he will not have served anywhere near the statutory maximum sentence of ten years, and "[a]t this stage, it is impossible to know whether a sentencing court would conclude that a term closer to the statutory maximum . . . is warranted." *Mackey*, 717 F.3d at 574. Moreover, even if Steffes is sentenced to time served, the government has a substantial interest in seeking supervised release where, like here, a defendant's mental illness prevents the defendant from "recogniz[ing] the seriousness of [his] conduct [and] suggests that [he] may pose a substantial threat of reoffending if set free." *Nicklas*, 623 F.3d at 1179 (quoting *United States v. White*, 620 F.3d 401, 430 (4th Cir. 2010) (Niemeyer, J., dissenting)). Thus, the amount of time that Steffes has been detained does not substantially weaken the government's interest in prosecution. *See id.* at 571-72, 574-75 (holding that when the defendant was subject to a Guidelines range of twenty to twenty-four months' imprisonment and a ten-year statutory maximum sentence, the government's interest in prosecution was not substantially weakened by the defendant's detention of about twenty-one months at the time of the *Sell* hearing).

The potential for civil commitment if not prosecuted also "affects, but does not totally undermine, the strength of the need for prosecution," because "lengthy confinement in an institution for the mentally ill . . . diminish[es] the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Sell*, 539 U.S. at 180. Steffes would be subject to civil commitment under 18 U.S.C. § 4246 if clear and convincing evidence established that his "release would create a substantial risk

of bodily injury to another person or serious damage to property of another." Somewhat similarly, under Iowa law, an interested person could initiate civil commitment proceedings against Steffes by filing an application indicating that Steffes "presents a danger to self or others," and he could be committed if the court found by clear and convincing evidence that Steffes is (1) "likely to physically injure" himself or others, (2) "likely to inflict serious emotional injury on" people "who lack reasonable opportunity to avoid contact with [him]," or (3) unable to care for his basic needs. Iowa Code §§ 229.1(20), 229.6, 229.13(1), 229.14.

Steffes has not yet been evaluated to determine his dangerousness upon release, and no witness testified on the issue. Mr. Laliberte's report, however, recommended that if Steffes is not involuntarily medicated, he should "remain at this facility for a mental health evaluation pursuant to [§ 4246] to assess whether . . . his release would create a substantial risk" of injury to another person or to property. Ex. 7 at 12. In August 2016, a psychiatrist at the Medical Center opined that Steffes did not present a threat to himself, others, or property in the correctional setting such that he could be involuntarily medicated without a court order. Doc. 166 at 19:2-10, 34:19-35:7. This is not strong evidence of Steffes's lack of dangerousness upon release, however, as he is currently confined in a locked unit by himself, not free to roam and interact with others (*id.* at 49:19-25). *See United States v. Grigsby*, 712 F.3d 964, 970, 972 (6th Cir. 2013) ("The government may be able . . . to prove that [defendant] presents a 'substantial risk of bodily injury . . .' under § 4246 even if he has been well-behaved and non-violent within the structured detention of [prison]."); *see also United States v. Gutierrez*, 704 F.3d 442, 450 (5th Cir. 2013) (finding "[n]otabl[e]" that the defendant had been found non-dangerous in the prison setting but recognizing that "[t]his finding . . . did not directly address [the defendant's] expected dangerousness . . . upon release"). The reason Steffes is kept away from other inmates is due to his tendency to be verbally

7

aggressive.  Doc. 166 at 35:8-11.  During his time at the Medical Center, Steffes occasionally cooperated and had calm conversations with his medical providers, but he also frequently became agitated and volatile.  *Id.* at 14:3-11, 49:1-50:11, 51:22-25; Ex. 7 at 7-9.  He screamed during conversations and kicked the door of his cell on multiple occasions.  *Id.*  Dr. Sarrazin testified that Steffes never threatened him, however.  *Id.* at 83:9-19.  Steffes has received at least ten incident reports during his time at the Medical Center.  *Id.* at 16:17-17:9.  Steffes received "one incident report for assault without serious injury" when he refused to return a food tray, but it is unclear whether that incident involved physical aggression or merely verbal threats.  *Id.* at 35:16-36:3.  He has not received any disciplinary reports for "laying hands on people."  *Id.* at 35:12-15.  Steffes's mental illness causes him to believe that many people are conspiring against him, including local law enforcement and his defense counsel; some of his other delusions include that people in prison are tampering with his food and that inmates sneak into his cell at night to shave his eyebrows.  Ex. 6 at 5, 10; Doc.166 at 15:23-17:9, 21:22-22:3, 43:4-11, 71:1-5, 83:9-19, 110:13-111:7.  During his competency evaluation in 2002, he was placed in a locked unit originally, in part because of "concern[s] about his assault potential because of his pervasive paranoid thinking."  Ex. K at 10.  Steffes has been hospitalized at a mental health institute at least six times, although it is unclear if he has previously been involuntarily committed under Iowa Code Section 229 or 18 U.S.C. § 4246.  Ex. O at 1; Ex. 5 at 5; Ex. 9 at 3-4.

The Eighth Circuit, like other circuit courts, has held that the government's interest in prosecution "remains strong" when the prospect of civil commitment is uncertain.  *Mackey*, 717 F.3d at 574; *see also Gutierrez*, 704 F.3d at 450 (collecting cases).  On the other hand, *Sell* refers to the "potential" of civil confinement, 539 U.S. at 180, and "absolute certainty of future civil confinement" is not required "to undermine the [government's] interest in prosecution," *United States v. Mikulich*, 732 F.3d 692,

8

699 (6th Cir. 2013). Given Mr. Laliberte's opinion that the next step was to evaluate Steffes for § 4246 purposes, Steffes's verbal aggression and paranoia, and that Steffes was kept locked up and segregated from the general inmate population, the potential for civil commitment exists here. Without an opinion from a medical expert and evidence of physical aggression, however, it is hard to predict with certainty whether Steffes will ultimately be committed. The government's interest in prosecution is weakened by the potential for civil commitment here, but not significantly so. *See Mackey*, 717 F.3d at 574 (8th Cir. 2013) ("[The defendant] does not concede that [the civil commitment] standard would be satisfied. Given the uncertainty of civil commitment and the government's interest in timely prosecution, the interest in prosecuting [the defendant] remains strong.").

Steffes relies on *Grigsby*, in which the Sixth Circuit held that the government failed to establish the first prong of the *Sell* test. 712 F.3d at 976. The facts in *Grigsby* with regard to civil commitment and the proportion of the sentence served are similar to the facts here: one of the defendant's doctor's testified that the next step was evaluation for civil commitment under § 4246, and if forcibly medicated, the defendant would likely have already served the recommended sentence under the Guidelines by the time his competency was restored. *Id*. at 971-74. The *Grigsby* defendant was accused of committing bank robberies by force, violence, and intimation, *id*. at 965, but this is not a persuasive distinguishing factor. Steffes similarly once threatened bank employees while brandishing a handgun, albeit more than twenty years ago. Ex. 9 at 12-13. Moreover, Steffes was locked in a segregated unit; was often verbally aggressive; and received numerous disciplinary reports, including one for making threats. In contrast, the defendant in *Grigsby* was "[h]oused in an open mental health unit, . . . followed the rules and procedures without any problem[,] . . . did not require . . . seclusion[,] and did not engage in any conflicts with peers or staff." 712 F.3d at 966. *Grigsby* can be

9

distinguished, however, because in addition to the special circumstances present here, the Sixth Circuit also relied on the likely unfairness of any trial due to the government's failure to establish that the defendant was unlikely to suffer side effects from medication. *Id.* at 974-76. Moreover, *Grigsby* relied on the defendant's Guidelines range, but as discussed above, the Eighth Circuit considers the statutory maximum more important.

Steffes argues that the government's interest in prosecution is lessened by the circumstances surrounding his alleged offense. He relies on *White*, in which the Fourth Circuit held that the nonviolent nature of the defendant's crimes—she was charged with identity theft and credit card fraud—lessened the government's interest in prosecution. 620 F.3d at 404, 419. *White* is inapplicable for several reasons. First, the Eighth Circuit has not addressed whether "the *White* court's distinction between violent and non-violent crimes is a proper consideration when determining the weight of the government's interest." *Nicklas*, 623 F.3d at 1180. Second, it is unclear whether being a felon in possession is a nonviolent offense. *See, e.g.*, *United States v. Dillard*, 214 F.3d 88, 89, 104 (2d Cir. 2000) (holding that "the crime of illegal possession of a firearm by a previously convicted felon involves . . . a substantial risk of violence" and is thus a violent crime for purposes of the Bail Reform Act). Most importantly, however, the circumstances surrounding the charged offense in *White* are distinguishable from the circumstances here. The Fourth Circuit in *White* noted that the defendant "did not physically harm any individuals," that no evidence indicated the defendant "is capable of or likely to commit future crimes of violence," and that the defendant did not meet the requirements for civil commitment. 620 F.3d at 419. Here, by contrast, Steffes has a lengthy history of assault convictions (albeit dated), including a 1997 conviction for assault while displaying a weapon, as well as a prior conviction for illegal possession of a firearm. Ex. 9. And as discussed above, the potential for civil commitment exists here.

10

In sum, the government's important interest in prosecuting Steffes is not undermined by special circumstances.

## B. The Second *Sell* Requirement

To satisfy the second *Sell* criterion, the government must prove (1) "that administration of the drugs is substantially likely to render the defendant competent to stand trial" and (2) "that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Sell*, 539 U.S. at 181. Rather than relying on generalities, the government must "relate the proposed treatment plan to the individual defendant's particular medical condition[,] . . . . considering all of the particular characteristics of the individual defendant relevant to such a determination." *United States v. Evans*, 404 F.3d 227, 241-42 (4th Cir. 2005); *see also Fazio*, 599 F.3d at 840-41 (addressing defendant's argument that the psychiatrist based his opinion "on the general prison population and not a specific analysis of [the defendant]"). The Eighth Circuit has held that a 5% to 10% chance of competency restoration is insufficient under the substantial likelihood standard but that a 70% success rate passes muster. *United States v. Ghane*, 392 F.3d 317, 320 & n.2 (8th Cir. 2004).

Dr. Sarrazin's proposed treatment plan sets forth several medication options. First, Dr. Sarrazin will attempt to persuade Steffes to voluntarily take oral medication in the face of a court order authorizing involuntary medication. Ex. 4 ¶ 1. If Steffes refuses, then he will be administered fluphenazine (trade name Proloxin) in the form of a short-acting injection. *Id.* ¶ 2. If Steffes tolerates daily dosages of fluphenazine for five days, then a long-acting form of fluphenazine will be used, the first injection of which will last for two weeks. *Id.* The dosage will be adjusted as deemed necessary for treatment or to manage side effects, and doses may last for two, three, or four weeks. *Id.*

11

As a second-place alternative to fluphenazine, Dr. Sarrazin's treatment plan proposes the use of haloperidol (trade name Haldol). It would be administered similarly to the fluphenazine: as a short-acting injection daily for five days, then a long-acting injection that would last for two weeks, and then adjusted as necessary. *Id.*

The only other antipsychotic medications that may be administered to Steffes involuntarily under Dr. Sarrazin's treatment plan are risperidone (trade name Risperdal) and aripiprazole (trade name Abilify). *Id.* Because these medications are not available as a short-acting injection, they would not be administered as a long-acting injection unless Steffes had previously tolerated a number of oral dosages.[2] *Id.*

Dr. Sarrazin testified that antipsychotic medications are classified as either first generation or second generation: fluphenazine and haloperidol are first generation; risperidone and aripiprazole are second generation. Doc. 166 at 75:1-23. First-generation drugs may cause side effects such as tiredness, stiffness, motor complaints, or akathisia (an uncomfortable and distressing motor restlessness) that are less likely to be an issue with second-generation drugs. Doc. 166 at 75:1-9, 76:3-7; Ex. K at 6. The proposed treatment plan lists several medications that can be used to manage side effects commonly caused by first-generation drugs. Ex. 4 ¶ 3. Dr. Sarrazin testified that many side effects of the first-generation drugs manifest only during the first few days of treatment and then disappear. Doc. 166 at 75:9-10. Side effects commonly caused by the second-generation drugs include metabolic issues, such as an increase in blood glucose or cholesterol, weight gain, an increase in appetite, or diabetes. *Id.* at 76:8-11, 95:13-24. Dr. Sarrazin testified that while at the Medical Center, Steffes would be

---

[2] I am crediting Dr. Sarrazin's written report over his testimony, in which he suggested that risperidone or paliperidone (trade name Invega) could be administered as a long-acting injection as part of his treatment plan, without a course of oral dosages first. Doc. 166 at 80:4-10.

closely monitored for the emergence of any potential side effects, including through regular glucose and cholesterol tests if taking second-generation drugs. *Id.* at 76:8-77:13.

Steffes has previously taken fluphenazine, haloperidol, and risperidone. Ex. 4 ¶ 1. Treatment notes from November 2008 and August 2014 reflect that Steffes was taking 25 milligrams of fluphenazine every two weeks in the form of a long-acting injection. Ex. O; Ex. P. Steffes complained of joint stiffness in August 2014, a side effect of fluphenazine. Ex. P at 3. Dr. Sarrazin testified that Steffes had been taking fluphenazine prior to his arrest in this case and that "he was stable and doing fairly well with the treatment." Doc. 166 at 73:12-18. Dr. Sarrazin posited that Steffes was found competent after the first competency evaluation in this case because of the fluphenazine in his system. *Id.* at 105:11-21. Fluphenazine did not completely eliminate Steffes's paranoid thoughts, however. *Id.*; Ex. P at 2.

Steffes suffered significant side effects while taking haloperidol in December 2001, and doctors stopped administering the drug to Steffes due to side effects. Ex. A; Ex. B; Ex. C; Ex. D; Ex. E; Ex. F; Ex. G. Side effects included akathisia, stiffness, slurred speech, unsteady gait, excessive drowsiness (e.g., he once fell asleep on a medical provider's shoulder), and drooling. *Id.* Steffes took his last two-week dose of haloperidol on December 6, 2001, and the side effects did not completely abate until the end of January 2002. Ex. A; Ex. B; Ex. G. Propranolol (trade name Inderal), benzatropine (trade name Cogentin), and clonazepam were all used to treat his side effects. Ex. C; Ex. E.

While taking haloperidol in 2001, Steffes also began taking risperidone. Ex. A. A treatment note from March 2002 reflects that he had gained weight and was sleeping excessively, possibly as a result of taking risperidone. Ex. H. In connection with his prior federal court case, Steffes voluntarily took two milligrams of risperidone a day from November 14, 2002, to December 18, 2002, while his competency was being evaluated

13

by a psychiatrist for the Bureau of Prisons. Ex. K at 1, 10. The psychiatrist determined that Steffes was not competent to stand trial. *Id.* at 13. Steffes went through competency-restoration proceedings from February 20, 2003, to June 26, 2003, and voluntarily took risperidone in increasing dosages, up to the maximum dosage of sixteen milligrams per day. Ex. L at 1-2. Steffes remained delusional, and a Bureau of Prisons psychiatrist opined that "[d]espite his apparent prior response to antipsychotic medications, . . . . [i]t is unlikely that he will be restored to competency in the foreseeable future." *Id.* at 3. Steffes continued taking risperidone, however, at a smaller dosage of eight milligrams per day, and by April 8, 2004, his competency had been restored. Ex. 10 at 22; Ex. M. Steffes testified that he was "overmedicated" when taking fifteen milligrams of risperidone a day and that that dosage caused him to fidget and drool. Doc. 166 at 113:3-9. During his competency restoration proceedings in 2003, medical reports demonstrate that Steffes "handled" sixteen milligrams of risperidone without side effects, but it is unclear how long Steffes took that dosage. *Id.* at 104:18-105:8.

Dr. Sarrazin testified that "it's substantially likely that [Steffes] would be restored to competency with antipsychotic medications." *Id.* at 81:15-18. He recognized that Steffes's delusions will never completely disappear, but they will fade "into the background" such that Steffes would be able to discuss his case. *Id.* at 106:4-11. He based his opinion on two reports, his personal experience treating schizophrenic patients, and Steffes's prior history.

Dr. Sarrazin testified that a 2012 report found that 79% of federal-court defendants suffering from psychotic-related illnesses were rendered competent by involuntary medication. *Id.* at 74:11-18. Although he believed that the study differentiated between different mental illnesses, he did not know the restoration rates for paranoid schizophrenics specifically. *Id.* at 92:23-93:6. He also relied on a 2007 report that found that 75% of patients involuntarily medicated at an Ohio state psychiatric hospital were

restored to competency. *Id.* at 74:19-23. These reports (as established by Dr. Sarrazin's testimony) do not address the efficacy of the specific drugs at issue, nor the efficacy of involuntary medication of paranoid schizophrenics, the specific disease at issue. As such, they have "very little" evidentiary value: to hold otherwise "'would be to find [that] the government necessarily meets its burden in every case it wishes to use . . . antipsychotic medication.'" *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 700 (9th Cir. 2010) (alteration in original) (quoting *Evans*, 404 F.3d at 241).

Nevertheless, other evidence supports Dr. Sarrazin's opinion. Dr. Sarrazin testified that 75% of patients involuntarily medicated at the Medical Center since 2002 have been restored to competency. Doc. 166 at 74:6-10. He estimated that the vast majority of those patients suffered from schizophrenia. *Id.* at 91:24-92:13. Most importantly, however, Dr. Sarrazin based his opinion on Steffes's prior successful treatment with risperidone and fluphenazine. *Id.* at 52:20-24, 77:14-20. The government has established that involuntary medication is substantially likely to render Steffes competent. *See United States v. Curtis*, 749 F.3d 732, 736-37 (8th Cir. 2014) (government established that involuntary administration of risperidone would restore competency based on general studies and prior treatment with risperidone); *Mackey*, 717 F.3d at 575 (government established that involuntary administration of medication would restore competency based on conclusory testimony from experts); *Fazio*, 599 F.3d at 840-41 (government established that involuntary administration of medication would restore competency based on doctor opining that there was a 75% to 87% chance of competency restoration after examining the defendant's medical history).

With regard to side effects, only those side effects that may "undermine the fairness of trial" are relevant during the second step of the *Sell* analysis. *Sell*, 539 U.S. at 179; *see also Evans*, 404 F.3d at 242 n.13. Important considerations include "[w]hether a particular drug will tend to sedate a defendant, interfere with communication

15

with counsel, prevent rapid reaction to trial developments, or diminish the ability to express emotions." *Sell*, 539 U.S. at 185. The most common side effects from second-generation drugs, although undesirable, are unlikely to hinder Steffes's ability to assist counsel. Moreover, Dr. Sarrazin's testimony establishes that many side effects from the first-generation drugs dissipate after a few days and that side effects are managed effectively through monitoring, dose adjustments, and other medications. Although Steffes may have suffered from some side effects of risperidone or fluphenazine from time to time, his treatment with those medications was generally successful, and the side effects were well-managed.

The same cannot be said of Steffes's treatment with haloperidol. Excessive tiredness to the point of falling asleep during meetings with medical providers is not conducive to preparing one's legal defense or communicating with counsel. Neither is slurred speech. Steffes suffered from both of these side effects while taking long-acting haloperidol in two-week doses, as well as other side effects. Steffes's doctors stopped his treatment with haloperidol due to the severity of the side effects he suffered. Dr. Sarrazin acknowledged that Steffes has "a significant issue with the haloperidol" and that he had "some difficulties" during his previous treatment with haloperidol. Doc. 166 at 73:4-6, 104:22-23. And although Dr. Sarrazin opined generally that antipsychotic medications would be substantially unlikely to cause side effects that would interfere with Steffes's ability to assist counsel, he did not opine specifically that haloperidol met that standard. Dr. Sarrazin suggested that the severity of Steffes's haloperidol side effects could have been caused by the long-acting dosage of haloperidol or the combination of treatment with risperidone and haloperidol, *id.* at 104:22-105:6, but the government bears the burden of proof here. It has not met its burden.

The government has proved by clear and convincing evidence that involuntary medication, as outlined in the treatment plan, is substantially unlikely to have side effects

16

that will interfere with Steffes's ability to assist counsel, with the exception of the involuntary administration of haloperidol.  The government has met the second *Sell* requirement.

### C. The Third *Sell* Requirement

To prove that involuntary medication is necessary, the government must prove "that any alternative, less intrusive treatments are unlikely to achieve substantially the same results" and that "less intrusive means for administering the drugs, *e.g.*, a court order to the defendant backed by the contempt power," are unavailable.  *Sell*, 539 U.S. at 181.  Steffes does not seriously argue that the government failed to meet its burden with regards to this requirement, and rightfully so.  Mr. Laliberte testified as to the methods used to attempt to restore Steffes's competency without medication.  Doc. 166 at 18:8-20:11.  When those methods failed, Mr. Laliberte opined that Steffes's competency would not be restored absent treatment with antipsychotic medication.  Ex. 7 at 12.  Similarly, Dr. Sarrazin testified that although "[i]ndividual therapy, case management, group therapy, family issue work, supportive employment, [and] supportive housing" may be used to treat Steffes's schizophrenia in conjunction with medication, these alternative methods will not restore Steffes's competency in the absence of medication.  Doc. 166 at 71:24-72:6.  Moreover, Dr. Sarrazin's treatment plan recognizes a preference that Steffes cooperates and agrees to take medication orally once faced with the prospect of injection of medication by force.  Ex. 4 ¶ 1.  Accordingly, I find that the government has proved the third *Sell* requirement by clear and convincing evidence, provided that Steffes is given the opportunity to comply with this court's order and take oral antipsychotic medication voluntarily, as outlined in the first paragraph of the proposed treatment plan.

17

### D. The Fourth *Sell* Requirement

Finally, the government must prove "that administration of the drugs is *medically appropriate, i.e.,* in the patient's best medical interest in light of his medical condition." *Sell*, 539 U.S. at 181. "The fourth *Sell* factor requires the district court to consider all of the circumstances relevant to the particular defendant and to consider the entirety of the consequences of the proposed involuntary medication[,] . . . . such as [the defendant's] need for long-term treatment and [the defendant's] current quality of life." *Curtis*, 749 F.3d at 737. The court should also consider "[t]he specific kinds of drugs at issue," including the difference in side effects and success rates amongst antipsychotic drugs. *Sell*, 539 U.S. at 181; *see also Evans*, 404 F.3d at 242 n.13 ("In considering whether involuntary medication is 'medically appropriate,' the district court should consider whether the medication is likely to produce *any* adverse side effects in the defendant, including, but not limited to those that may interfere with the defendant's right to a fair trial." (citation omitted)).

Mr. Laliberte testified that medication is the best method of treating Steffes's mental illness and will give him a better quality of life. Doc. 166 at 26:5-18. Dr. Tyner testified that medication is the primary recommended treatment for schizophrenia, that medication will improve Steffes's mental health, and that he will not approach mental stability without medication. *Id.* at 64:1-65:1. Dr. Sarrazin testified that even if competency restoration was not at issue, he would recommend that Steffes take antipsychotic medication to help treat his illness, especially since medication improved his symptoms in the past. *Id.* at 81:5-14. Although medication is unlikely to completely eliminate Steffes's delusions, it will lessen their prominence so that Steffes can think more clearly and have personal interactions that do not revolve around his delusional thoughts. *Id.* at 105:20-106:11. Dr. Sarrazin recognized that schizophrenic patients often stop taking their medication due to their delusions, as demonstrated by Steffes's

18

past history. *Id.* at 80:21-81:14. He also admitted that he had no way to ensure continued treatment of Steffes once he leaves the Medical Center but suggested that the court make clear that the county jail must continue Dr. Sarrazin's recommended treatment of Steffes. *Id.* at 103:3-9. "Assuming [Steffes] is restored to competency, the [c]ourt [should] review any recommendations as to the continued treatment of [Steffes] that . . . the . . . Medical Center may provide, and will then direct the Marshal's Service and the detaining facility to make appropriate provisions for his continued medical care and treatment." *United States v. Nicklas*, No. 08-50090, 2009 WL 3872140, at *2 (W.D. Ark. Nov. 18, 2009), *aff'd*, 623 F.3d 1175. I find that the evidence establishes that the involuntary administration of antipsychotic medication of some sort is medically appropriate.

With regard to particular medications, I have already determined that the potential side effects of haloperidol as applied to Steffes will likely interfere with his ability to assist counsel. I similarly find that the side effects suffered previously by Steffes while taking long-acting injectable haloperidol demonstrate that the government has not proved by clear and convincing evidence that treatment with haloperidol is medically appropriate, especially considering that Steffes has better tolerated other drugs that restored his competency in the past.

There is also evidence that high doses of risperidone caused Steffes side effects. I credit Steffes's testimony that taking fifteen milligrams of risperidone a day caused him to drool and fidget, since the record demonstrates that the dosage was reduced to eight milligrams a day shortly after he left the Medical Center (where he had been taking sixteen milligrams a day). Doc. 166 at 113:3-9; Ex. L at 2; Ex. M at 1-2. I also find that Steffes would be less likely to continue treatment of such a high dosage of risperidone once released due to the side effects (as Dr. Sarrazin testified, schizophrenic patients often stop taking their medications). Because a dosage of eight milligrams of risperidone daily restored Steffes's competency and treated his illness in the past, the government has

not established the medical appropriateness of a fifteen-milligram daily dosage, which is likely to cause Steffes unpleasant side effects.

This evidence of Steffes's side effects from risperidone relates to a daily oral dosage of risperidone, not a long-acting injection given every two weeks. The proposed treatment plan sets forth the maximum daily dosages of risperidone when taken in oral form (sixteen milligrams), but it does not set forth any dosage information when risperidone is administered involuntarily in the form of a long-acting injection. Ex. 4. Dr. Sarrazin testified that the long-acting injection of risperidone would be given every two weeks, but he did not testify as to the dosage range. Doc. 166 at 79:22-24. The Fourth Circuit has held that to meet the fourth *Sell* requirement, the government must set forth the maximum dosage for each medication in the proposed treatment plan, *Evans*, 404 F.3d at 241-42; and the Tenth and Ninth Circuits have held that the court must include this information in its *Sell* order, *United States v. Chavez*, 734 F.3d 1247, 1253 (10th Cir. 2013); *United States v. Hernandez-Vasquez*, 513 F.3d 908, 916-17 (9th Cir. 2008). The maximum FDA-approved dosage of risperidone in injection form to treat schizophrenia is fifty milligrams every two weeks; the usual dosage is twenty-five milligrams every two weeks. Wolter's Kluwer, RisperiDONE Injection, Drug Facts and Comparisons (last updated March 16, 2017), http://fco.factsandcomparisons.com/lco/action/doc/retrieve/docid/fc_dfc/5549354 (subscription required). Because Steffes suffered from side effects while on higher dosages of risperidone, I find that the government has not established that the involuntary administration of the maximum dosage of risperidone is medically appropriate. If Steffes tolerates an oral course of risperidone but then begins to refuse treatment, as set forth in the proposed treatment plan, I find that the involuntary administration of twenty-five milligrams of risperidone every two weeks is unlikely to cause Steffes side effects and is thus medically appropriate.

As with risperidone, the government's proposed treatment plan does not set forth any dosage information regarding long-acting aripiprazole injections, although Dr. Sarrazin testified that it would be administered every four weeks. Ex. 4; Doc. 166 at 80:11-15. Three hundred to four hundred milligrams of aripiprazole injected monthly is the usual dosage of that drug to treat schizophrenia, and there is no well-established maximum dosage. Wolter's Kluwer, ARIPiprazole Injection, Drug Facts and Comparisons (last updated May 3, 2017), http://fco.factsandcomparisons.com/lco/action/doc/retrieve/docid/fc_dfc/5549342 (subscription required). I find that the government has established that the involuntary administration of aripiprazole as set forth in the proposed treatment plan is medically appropriate, as long as no more than four hundred milligrams of aripiprazole is administered every four weeks. Under the proposed treatment plan, aripiprazole will not be administered as a long-acting injection unless Steffes first tolerates a course of daily oral dosages. As a second-generation drug, aripiprazole carries less of a risk of motor-related side effects than first-generation drugs, and it is less likely to cause sedation and tiredness. Doc. 166 at 76:3-7. Steffes has previously tolerated another second-generation drug, risperidone, and Dr. Sarrazin's treatment plan identifies how Steffes will be monitored for any metabolic disorders that develop as a result of taking aripiprazole. Ex. 4 ¶¶ 5-6.

I do not find that fluphenazine poses a risk of side effects that render its administration medically inappropriate. Steffes has previously tolerated fluphenazine. Doc. 166 at 73:12-18.

Thus, the involuntary administration of fluphenazine, risperidone, and aripiprazole, as set forth in the treatment plan and subject to the maximum dosages outlined in this report and recommendation, is medically appropriate.

### III.    CONCLUSION

I respectfully recommend that the district court **grant** the government's motion and authorize involuntary medication. I emphasize that Steffes should be given the chance to take antipsychotic medication voluntarily, as set forth in paragraph 1 of the proposed treatment plan. Steffes should be medicated in accordance with the government's proposed treatment plan (Doc. 160-3), subject to the modifications set forth in this report and recommendation. Specifically, I recommend that the court authorize:

1. The involuntary administration of risperidone through long-acting injection, with a maximum dosage of 25 milligrams every two weeks (provided that Steffes first tolerates an oral course of risperidone),

2. The involuntary administration of aripiprazole through long-acting injection, with a maximum dosage of 400 milligrams every four weeks (provided that Steffes first tolerates an oral course of aripiprazole), and

3. The involuntary administration of fluphenazine through long-acting injection, with a dosage range of 12.5 milligrams to 100 milligrams every two, three, or four weeks.

Before each forced administration of medication, staff should first request that Steffes take medication voluntarily.

Relatedly, I also recommend that the district court **grant** the government's request and extend Steffes's commitment under 18 U.S.C. § 4241(d)(2)(A) for an additional reasonable period of time, as there is a substantial probability that Steffes's competency will be restored through medication. I recommend that the district court order that after Steffes has been committed for an additional five-month period[3] (or, if sooner, whenever

---

[3] As noted earlier, Dr. Sarrazin testified that competency restoration would likely take five to seven months.

his competency is restored), the Medical Center file a status report with the court detailing Steffes's treatment thus far, including whether Steffes's symptoms have improved, whether Steffes has suffered from any side effects, and whether and when Steffes's competency is likely to be restored.

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections. LCrR 59. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED** this 9th day of June, 2017.

.

Kelly K.E. Mahoney
United States Magistrate Judge
Northern District of Iowa