**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR15-3019-LTS |
| Plaintiff, | |
| vs. | **MEMORANDUM OPINION AND ORDER ON REPORT AND RECOMMENDATION** |
| MARK ALAN STEFFES, | **(filed under seal)** |
| Defendant. | |

---

## I.     INTRODUCTION

This case is before me on a sealed Report and Recommendation (R&R) filed on June 9, 2017, by the Honorable Kelly K.E. Mahoney, United States Magistrate Judge. *See* Doc. No. 170.  Judge Mahoney recommends that I grant the Government's motion (Doc. No. 143) for involuntary medication of defendant Mark Alan Steffes (Steffes) to attempt to render him competent for trial.  Steffes has filed an objection.  (Doc. No. 171).

## II.     APPLICABLE STANDARDS

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court.  A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also

receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

### III. THE R&R

Judge Mahoney provided the following background in her R&R:

> On April 14, 2015, state law enforcement officers found Steffes in possession of a handgun after he attempted to purchase a firearm, despite his status as a felon. Ex. Q at 2-3. That same day, he was arrested and detained on state charges. *Id.* On May 21, 2015, a federal grand jury returned an indictment charging Steffes with possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Doc. 2. He remained in state custody until his arrest on the federal charge on May 28,

2

2015. Doc. 12. The next day, Steffes made his initial appearance in this court (Doc. 6), and the court ordered that Steffes be detained pending trial (Docs. 14, 16).

After Steffes moved for a competency evaluation (Doc. 19), the court ordered him committed to the custody of the Attorney General for thirty days for a mental health evaluation, in accordance with 18 U.S.C. §§ 4241(b) and 4247(b) (Doc. 20). The Bureau of Prisons issued a report on August 26, 2015, opining that Steffes was competent to proceed to trial. Doc. 38-1; Ex. 5. Shortly thereafter, the court held a competency hearing and found Steffes competent. Doc. 38.

Steffes's condition deteriorated, and on March 3, 2016, Steffes moved for a second competency evaluation. Doc. 105. The court once again committed Steffes for thirty days so that his mental health could be evaluated. Doc. 112. A psychologist for the Metropolitan Correctional Center in Chicago, where Steffes had been receiving treatment, issued a report on May 3, 2016, deeming Steffes incompetent. Doc. 122; Ex. 6. After holding a competency hearing on May 24, 2016 (Doc. 127), the court issued a written opinion finding that Steffes "suffers from a mental disease or defect which . . . render[s] him mentally incompetent to the effect that he is (a) unable to understand the nature and consequences of the proceeding against him, or (b) unable to assist properly in his defense" (Doc. 128). In accordance with 18 U.S.C. § 4241(d), the court committed Steffes to the custody of the Attorney General "for such reasonable period of time, not to exceed 120 days, as is necessary to determine whether there is a substantial probability" of Steffes's competency being restored. Doc. 128. Steffes's treatment began on June 23, 2016, at the U.S. Medical Center for Federal Prisoners in Springfield, Missouri (the Medical Center). Doc. 133.

The government filed the current motion on December 9, 2016, requesting (1) that the defendant be committed for an additional reasonable period of time under 18 U.S.C. § 4241(d)(2)(A); (2) that the court order the involuntary administration of antipsychotic medication to Steffes as part of his treatment; and (3) that the court hold a hearing on the issue of involuntary medication to determine whether the standard set forth in *Sell v. United States*, 539 U.S. 166 (2003), was satisfied. Doc. 143. The government submitted as an exhibit a November 4, 2016, letter from the warden of the Medical Center, requesting additional time for competency restoration, and an attached competency report prepared by Benjamin

3

Laliberte, a doctorate student in clinical psychology interning at the Medical Center Ex. 1; Ex. 7; Doc. 144. Mr. Laliberte opined that Steffes remained incompetent and that his competency would not likely be restored without antipsychotic medication, which Steffes refused to take voluntarily. Ex. 7 at 12.

The court held a *Sell* hearing on April 1[1], 2017. Doc. 159. Three witnesses testified on behalf of the government; Mr. Laliberte; Dr. Elizabeth Tyner, a psychologist at the Medical Center and Mr. Laliberte's supervisor; and Dr. Robert Sarrazin, a psychiatrist at the Medical Center. *Id.* In addition, the government submitted, and the court admitted, ten exhibits into evidence. *Id.* Steffes submitted, and the court admitted, seventeen exhibits, and Steffes was given the opportunity to testify to the court. *Id.* On May 3, 2017, the government submitted a brief arguing in support of involuntary medication (Doc. 168), and Steffes submitted a brief in resistance (Doc. 169).

Doc. No. 170 at 2-4.

Judge Mahoney began her analysis by listing the *Sell* factors, which must be met for the Government to "administer antipsychotic drugs involuntarily to a mentally ill criminal defendant . . . to render that defendant competent to stand trial for serious, but nonviolent, crimes . . . in limited circumstances." *Sell*, 539 U.S. at 169. These factors are: "(1) that an important governmental interest is at stake; (2) that involuntary medication will significantly further that governmental interest; (3) that involuntary medication is necessary to further that interest; and (4) that administration of the drugs is medically appropriate." *United States v. Mackey*, 717 F.3d 569, 573 (8th Cir. 2013) (citing *Sell*, 539 U.S. at 180-81). She also noted the Government must prove the final three *Sell* factors by clear and convincing evidence. *See United States v. Fazio*, 599 F.3d 835, 840 n.2 (8th Cir. 2010).

As to the first *Sell* requirement, Judge Mahoney noted the parties agree that possession of a firearm by a felon is a serious crime. However, they dispute whether special circumstances lessen the importance of the Government's interest in prosecuting Steffes. Those circumstances include the time Steffes has already served and the potential

4

for civil commitment. Judge Mahoney noted that Steffes has been detained for 24 months pending trial. Doc. No. 170 at 5. The parties agree that his Guideline range, if convicted, would be between 15 and 33 months and that he would be subject to the statutory maximum of 10 years' imprisonment. *Id.* Dr. Sarrazin testified that restoring Steffes' competency would likely take five to seven months and an appeal of an order of involuntary medication would also extend the duration of his detention. The Government argued that its interest in prosecuting Steffes is not weakened by the amount of time he has been detained because it will seek supervised release. Judge Mahoney agreed and found that the amount of time Steffes has been detained does not substantially weaken the Government's interest in prosecution.

As for whether civil commitment would affect the Government's interest in prosecuting Steffes, Judge Mahoney noted that Steffes has not yet been evaluated to determine his dangerousness upon release and that no witnesses testified on the issue. While he has been hospitalized at a mental health institute on at least six occasions, it is unclear whether he has ever been involuntarily committed under Iowa Code chapter 229 or 18 U.S.C. § 4246. Under Eighth Circuit precedent, the Government's interest in prosecution "remains strong" when the prospect of civil commitment is uncertain. *Id.* at 8 (citing *Mackey*, 717 F.3d at 574). However, Judge Mahoney noted that *Sell* referred only to the "potential" of civil confinement and that "absolute certainty of future civil confinement" is not required "to undermine the [government's] interest in prosecution." *Id.* (quoting *Sell*, 539 U.S. at 180 and *United States v. Mikulich*, 732 F.3d 692, 699 (6th Cir. 2013) respectively). Nonetheless, she concluded the Government's interest in prosecuting Steffes was slightly weakened by the potential for civil commitment, but not significantly, such that the Government met the first *Sell* requirement. *Id.* at 9.

Under the second *Sell* requirement, Judge Mahoney noted the Government must prove (1) "that administration of the drugs is substantially likely to render the defendant competent to stand trial" and (2) "that administration of the drugs is substantially unlikely

to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." Doc. No. 170 at 11 (quoting *Sell*, 539 U.S. at 181). Judge Mahoney then described Dr. Sarrazin's proposed treatment plan as follows:

> First, Dr. Sarrazin will attempt to persuade Steffes to voluntarily take oral medication in the face of a court order authorizing involuntary medication. Ex. 4 ¶ 1. If Steffes refuses, then he will be administered fluphenazine (trade name Proloxin) in the form of a short-acting injection. *Id.* ¶ 2. If Steffes tolerates daily dosages of fluphenazine for five days, then a long-acting form of fluphenazine will be used, the first injection of which will last for two weeks. *Id.* The dosage will be adjusted as deemed necessary for treatment or to manage side effects, and doses may last for two, three, or four weeks. *Id.*
>
> As a second-place alternative to fluphenazine, Dr. Sarrazin's treatment plan proposes the use of haloperidol (trade name Haldol). It would be administered similarly to the fluphenazine: as a short-acting injection daily for five days, then a long-acting injection that would last for two weeks, and then adjusted as necessary. *Id.*
>
> The only other antipsychotic medications that may be administered to Steffes involuntarily under Dr. Sarrazin's treatment plan are risperidone (trade name Risperdal) and aripiprazole (trade name Abilify). *Id.* Because these medications are not available as a short-acting injection, they would not be administered as a long-acting injection unless Steffes had previously tolerated a number of oral dosages. *Id.*

*Id.* at 11-12 (footnote omitted). She also discussed Dr. Sarrazin's testimony regarding the monitoring for and management of side effects, including additional medications that could be used to help relieve those side effects. *Id.*

Judge Mahoney noted that Steffes has previously taken fluphenazine, haloperidol and risperidone. *Id.* at 13. According to treatment notes from November 2008 and August 2014, he took the long-acting injection form of fluphenazine every two weeks. Prior to his arrest, Steffes had been "stable and doing fairly well" with the fluphenazine treatment. *Id.* Indeed, Dr. Sarrazin suggested that Steffes was found competent after

6

the first competency evaluation because of the fluphenazine in his system. However, it did not completely eliminate his paranoid thoughts. *Id.*

With regard to haloperidol, doctors stopped administering it in December 2001 due to side effects such as akathisia, stiffness, slurred speech, unsteady gait, excessive drowsiness and drooling. *Id.* Steffes took his last two-week dose of haloperidol on December 6, 2001, but his side effects continued until January 2002. Steffes had to take three different medications to treat his side effects. *Id.*

Steffes also began taking risperidone in 2001, while taking haloperidol. He experienced weight gain and excessive sleep in March 2002, which was considered possibly related to the risperidone. *Id.* He took two milligrams of risperidone a day from November 14, 2002, to December 18, 2002, while his competency was being evaluated in connection with a prior federal court case. *Id.* He was deemed not competent to stand trial. *Id.* at 14. He went through competency-restoration proceedings from February 20, 2003, to June 26, 2003, and voluntarily took risperidone in increasing dosages until reaching the maximum dose of 16 milligrams per day. *Id.* His risperidone regimen was later reduced to eight milligrams a day and his competency was restored by April 8, 2004. *Id.* In a hearing for this motion, Steffes testified that he had been "overmedicated" while taking 15 milligrams of risperidone a day, which caused him to fidget and drool. Records from the 2003 competency restoration proceedings indicate that he "handled' the 16 milligrams of risperidone without side effects, but it is unclear how long he took that dosage. *Id.*

In the hearing for this motion, Dr. Sarrazin testified that it is "substantially likely" that Steffes' competency would be restored with antipsychotic medications. He stated that Steffes' delusions may never completely disappear, but will fade "into the background" so that Steffes can be involved in his case. He testified that since 2002, 75 percent of patients involuntarily medicated at the Medical Center have been restored to competency. *Id.* at 15. He estimated that the vast majority of those patients suffered

7

from schizophrenia. Dr. Sarrazin also based his opinion on Steffes' prior successful treatment with risperidone and fluphenazine. Judge Mahoney concluded the Government met its burden of proving that involuntary medication is substantially likely to render Steffes competent. *Id.*

With regard to side effects, Judge Mahoney noted that only those side effects that may "undermine the fairness of trial" are relevant to the second *Sell* requirement. *Id.* (citing *Sell*, 539 U.S. at 179). She noted that the most common side effects from the second-generation drugs are unlikely to hinder Steffes' ability to assist with his case. *Id.* at 16. The side effects from the first-generation drugs dissipate after a few days and can be effectively managed through monitoring, dose adjustments and other medications. *Id.* Judge Mahoney stated that while Steffes has previously suffered some side effects on risperidone and fluphenazine, his treatment with those medications was generally successful and his side effects well-managed. *Id.*

Judge Mahoney did not find that to be the case with haloperidol. *Id.* Medical records showed Steffes experienced excessive tiredness to the point of falling asleep during meetings with medical providers and had slurred speech. *Id.* Indeed, his side effects were so severe that doctors stopped treating him with haloperidol. While Dr. Sarrazin testified that antipsychotic medications were unlikely to cause side effects that would interfere with Steffes' ability to assist counsel, he did not address haloperidol specifically. *Id.* He suggested that the haloperidol side effects could have been the result of the long-acting dosage or combination with other medications, but Judge Mahoney found that the Government failed to meet its burden of proving that involuntary medication of haloperidol was substantially unlikely to have side effects that would interfere with Steffes' ability to assist counsel. *Id.* at 16-17. Therefore, Judge Mahoney found the Government met the second *Sell* requirement, with the exception of the involuntary administration of haloperidol.

Under the third *Sell* requirement, the Government must prove "that any alternative, less intrusive treatments are unlikely to achieve substantially the same results" and that "less intrusive means for administering the drugs, *e.g.*, a court order to the defendant backed by the contempt power," are unavailable. *Id.* at 17 (quoting *Sell*, 539 U.S. at 181). Judge Mahoney noted that both Mr. Laliberte and Dr. Sarrazin testified about all the other methods that have been tried but failed to restore Steffes' competency. Dr. Sarrazin testified that several other types of treatment, including various types of therapy and supportive employment and housing could be used to treat Steffes' schizophrenia in conjunction with medication, but that his competency could not be restored without medication. *Id.* The treatment plan also contemplates asking Steffes to voluntarily take the medication before involuntarily administering it. Judge Mahoney concluded the Government proved the third *Sell* requirement.

The fourth *Sell* factor requires that the administration of the drugs be "*medically appropriate, i.e.*, in the patient's best medical interest in light of his medical condition." *Sell*, 539 U.S. at 181 (emphasis in original). Judge Mahoney noted all the circumstances the court must consider, including the defendant's need for long-term treatment, the defendant's current quality of life, the kind of drugs at issue, side effects and rates of success. *See* Doc. No. 170 at 18. She referenced testimony from three professionals who concluded that medication was the recommended treatment for Steffes' mental health. *Id.* Dr. Sarrazin also testified that schizophrenic patients often stop taking their medication due to their delusions, but he recommended Steffes continue treatment even after leaving the Medical Center, if his competency could not be restored. *Id.* at 18-19. Judge Mahoney concluded that the involuntary administration of antipsychotic medication of some sort is medically appropriate.

With regard to specific medications, she concluded that the side effects of haloperidol would likely interfere with Steffes' ability to assist counsel and that the Government similarly had not proved by clear and convincing evidence that treatment

9

with haloperidol would be medically appropriate based on the previous side effects he suffered and the fact that he better tolerated other drugs that restored his competency. *Id.* at 19.

Judge Mahoney also found that the Government failed to establish that the maximum dosage of risperidone would be medically appropriate. *Id.* at 19-20. Steffes testified that taking 15 milligrams of risperidone a day caused him to drool and fidget. Judge Mahoney credited this testimony, noting that Steffes' dosage was reduced to eight milligrams a day after he left the Medical Center and his competency was later restored. *Id.* Under the proposed treatment plan, long-acting injection of risperidone would be given every two weeks, but no dosage information was provided. *Id.* at 20. Several courts have held that the fourth *Sell* requirement requires the Government to set forth the maximum dosage for each medication in the proposed treatment plan. *Id.* While the Government provided the maximum daily dosage in oral form (16 milligrams), it did not provide maximum dosage in the long-acting injection form. Nonetheless, Judge Mahoney found, based on a credible source, that the maximum FDA-approved dosage in injection form is 50 milligrams every two weeks while the usual dosage is 25 milligrams every two weeks. *Id.* She concluded that if Steffes tolerated the oral course of risperidone and later refused treatment, the involuntary administration of 25 milligrams of risperidone every two weeks would be medically appropriate. *Id.*

Finally, with regard to aripiprazole, Judge Mahoney noted the Government again failed to provide the dosage information for the long-acting injection form of this drug. *Id.* at 21. According to a credible source, 300 to 400 milligrams of aripiprazole injected monthly is the usual dosage to treat schizophrenia and there is no well-established maximum dosage. *Id.* (citing Wolter's Kluwer, ARIPiprazole Injection, Drug Facts and Comparisons (last updated May 3, 2017), http://fco.factsandcomparisons.com/lco/action /doc/retrieve/docid/fc_dfc/5549342 (subscription required)). The proposed treatment plan provides that aripiprazole will not be administered in the long-acting injection form

unless Steffes first tolerates a course of daily oral dosages. *Id.* This drug carries less of a risk for side effects and is less likely to cause sedation and tiredness. Steffes previously tolerated another second-generation drug and the treatment plan calls for monitoring of any metabolic disorders that could develop as a result. *Id.* Judge Mahoney concluded that the Government had established that the involuntary administration of aripiprazole as set forth in the proposed treatment plan is medically appropriate, as long as no more than 400 hundred milligrams is administered every four weeks. *Id.* Judge Mahoney found no risk of side effects with fluphenazine and found its involuntary administration to be appropriate. *Id.*

In sum, under the fourth *Sell* requirement Judge Mahoney found the involuntary administration of fluphenazine, risperidone (up to 25 milligrams every two weeks) and aripiprazole (up to 400 milligrams every four weeks) is medically appropriate.

Judge Mahoney recommends that I grant the Government's motion for involuntary medication, that Steffes be given the opportunity to voluntarily take the medication each time it is scheduled to be administered and that the Government's proposed treatment plan be adopted with the following modifications:

1. The involuntary administration of risperidone through long-acting injection, with a maximum dosage of 25 milligrams every two weeks (provided that Steffes first tolerates an oral course of risperidone)

2. The involuntary administration of aripiprazole through long-acting injection, with a maximum dosage of 400 milligrams every four weeks (provided that Steffes first tolerates an oral course of aripiprazole) and

3 The involuntary administration of fluphenazine through long-acting injection, with a dosage range of 12.5 milligrams to 100 milligrams every two, three, or four weeks.

Judge Mahoney also recommends that I grant the Government's request to extend Steffes' commitment under 18 U.S.C. § 4241(d)(2)(A) for an additional reasonable period

11

of time and require a status report after five months (or sooner if competency is restored), detailing Steffes' treatment, including whether his symptoms have improved, whether he has suffered from any side effects and whether and when his competency is likely to be restored.

## IV.    DISCUSSION

Steffes objects to the R&R based on the following grounds:

A.    The length of Steffes' incarceration to date and before any trial lessens the Government's interest in prosecuting him.

B.    The probability of civil commitment substantially weakens the Government's interest in prosecuting Steffes.

C.    The Government has a lesser interest in prosecuting a nonviolent offense like Steffes', as compared to a violent offense.

D.    Involuntary medication is not substantially likely to restore Steffes' competency.

E.    Involuntary medication is substantially likely to cause side effects that would interfere with any trial.

F.    Because the Government failed to prove that involuntary medication will significantly further any important interest, it also failed to prove that involuntary medication is necessary.

G.    The Government's treatment plan failed to establish that involuntary medication is medically appropriate.

See Doc. No. 171. Each of these arguments was raised in Steffes' resistance (Doc. No. 168) to the Government's motion and was considered in the R&R. I have conducted a careful, de novo review of Steffes' objections and Judge Mahoney's analysis of these points in the R&R. Because I agree with Judge Mahoney's thorough analysis of each of

12

the issues raised in Steffes' objections and find no error based on my own review of the record, my discussion of the objections will, for the most part, be brief.

## A.   The First _Sell_ Requirement

### 1.   Length of Pretrial Detention

Steffes argues that Judge Mahoney did not give sufficient weight to the fact that he will have likely served a Guidelines sentence by the time this issue is resolved. While I agree with Steffes that it appears he will have already served a Guidelines sentence[1] if convicted, but note that the Government's interest in prosecution goes beyond mere punishment. As Judge Mahoney noted, the Government also has an interest in seeking supervised release for rehabilitation purposes, especially under the circumstances here. Moreover, the Government has an interest in deterring defendants from becoming repeat offenders. A conviction in this case could result in harsher penalties if Steffes commits future crimes. For these reasons, and the additional reasons provided in the R&R, I find that the length of Steffes' pretrial detention does not undermine the Government's interest in prosecuting him. This objection is overruled.

---

[1] Steffes argues that the Eighth Circuit's approach of considering the statutory maximum, rather than the Guidelines, is flawed. I disagree and note that the first _Sell_ requirement raises two separate issues: (1) "the Government's interest in bringing to trial an individual accused of a serious crime" and (2) "special circumstances that may lessen the importance of the Government's interest in prosecution." _Sell_, 539 U.S. at 180. The Eighth Circuit's reference to the statutory maximum is a measure of the seriousness of the offense. _See United States v. Mackey_, 717 F.3d 569, 573 (8th Cir. 2013) ("In determining the seriousness of the offense, we agree with those circuits that place the greatest weight on the maximum penalty authorized by statute . . ., as it is the most relevant objective indication of the seriousness with which society regards the offense."). The fact that Steffes may have already served a near-Guidelines sentence is a special circumstance. Because the parties agree that possession of a firearm by a felon is a serious crime, _see_ Doc. No. 170 at 5, I do not find the statutory maximum to be relevant to his objection.

13

### 2.    *Probability of Civil Commitment*

Steffes argues that civil commitment is likely and significantly diminishes the Government's interest in prosecution.   He disagrees that the likelihood of civil commitment is hard to predict, noting that evaluators at the Medical Center have recommended he be evaluated for civil commitment pursuant to 18 U.S.C. § 4246 if he is not involuntarily medicated to restore trial competency.   Moreover, he notes that he has had at least six previous hospitalizations at the Cherokee Mental Health Institute as of 2008.   He argues that involuntary medication to restore trial competency delays the inevitable civil commitment proceedings.

Judge Mahoney spent over three pages in her R&R discussing these arguments and the evidence related to them.   *See* Doc. No. 170 at 6-10.   Importantly, she noted that Steffes "has not yet been evaluated to determine his dangerousness upon release, and no witness testified on the issue."   *Id.* at 7.   I agree with her detailed analysis and conclusion that the Government's interest in prosecution is not significantly undermined by the likelihood of civil commitment.   This objection is overruled.

### 3.    *Nonviolent Offense*

Steffes argues the nonviolent nature of his offense diminishes the Government's interest in prosecuting him.   He was arrested outside of his home while in possession of a firearm that he did not use to harm or threaten anyone.   Under the Guidelines, he argues he would not receive an enhancement for the use, attempted use or threatened use of physical force under § 4B1.2(a).

Again, Judge Mahoney thoroughly considered this issue, specifically noting that the Eighth Circuit has not addressed whether "the *White* court's distinction between violent and non-violent crimes is a proper consideration when determining the weight of the government's interest."   *Id.* at 10 (citing *United States v. Nicklas*, 623 F.3d 1175,1180 (8th Cir. 2010)).   She also noted it is unclear whether being a felon in

14

possession of a firearm is a nonviolent offense and that Steffes' criminal history is not devoid of violence (even though it is dated). I agree with Judge Mahoney that the circumstances surrounding the offense do not undermine the Government's interest in prosecuting Steffes. This objection is overruled.

## B.    The Second _Sell_ Requirement

Under the second *Sell* requirement, the Government must prove: (1) "that administration of the drugs is substantially likely to render the defendant competent to stand trial and (2) "that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Sell*, 539 U.S. at 181. Steffes objects to the R&R findings on both parts of this requirement.

### 1.    Whether Involuntary Medication is Substantially Likely to Restore Steffes' Competency

Steffes argues Judge Mahoney erred in crediting Dr. Sarrazin's testimony that "75% of patients involuntarily medicated at the [Springfield] Medical Center since 2002 have been restored to competency." Doc. No. 170 at 15. He states that Dr. Sarrazin's estimate is based on individuals found to be competent at the Medical Center, but says nothing about whether these individuals remained competent throughout their court proceedings after leaving Springfield.

Steffes also takes issue with Judge Mahoney's finding that Steffes had prior successful treatment with risperidone and fluphenazine. Doc. No. 171 at 5 (quoting Doc. No. 170 at 15). He argues Steffes' past treatment with those drugs has not been that successful. While he did achieve competency when taking risperidone in the past, he remained delusional while taking up to eight milligrams of the drug per day. *Id.* (citing Doc. No. 156-13 at 1). He also notes that while taking fluphenazine in August 2014, he

15

"continue[d] with paranoid ideation related to a neighbor who he report[ed] is a brother of a man [who] previously was disruptive to his life. *Id.* (citing Doc. No. 156-16 at 2).

I find no error with regard to the weight Judge Mahoney assigned to Dr. Sarrazin's testimony. While his statement regarding the percentage of patients whose competency was restored after involuntary medication says nothing with regard to how long that competency was retained, I do not find that to be a reason to discredit his testimony. Dr. Sarrazin was not asked what percentage of these individuals retained competency for trial and there is no evidence in the record regarding how long restored competency lasts for individuals with schizophrenia.

With regard to the "success" of risperidone and fluphenazine, Judge Mahoney noted that Dr. Sarrazin's opinion was based on Steffes' prior successful treatment on these drugs and "[a]lthough Steffes may have suffered from some side effects of risperidone or fluphenazine from time to time, his treatment with those medications was generally successful, and the side effects were well-managed." Doc. No. 170 at 16. It is important to keep in mind that "success" in this context is equivalent to competency. Steffes acknowledges that he was restored to competency while on risperidone, but points out that he remained delusional while taking up to eight milligrams of the drug per day. *See* Doc. No. 171 at 5 (citing Doc. No. 156-13 at 1). This comes from an October 2003 treatment record from Cherokee Mental Health in which the doctor noted that Steffes said he was feeling "great" and was pleased his Risperdal (trade name for risperidone) had been increased up to eight milligrams per day. Doc. No. 156-13. Yet, his delusions persisted. *Id.* This is consistent with Dr. Sarrazin's testimony while discussing Steffes' previous treatment with Risperdal:

> [W]e're looking for these antipsychotics to control the symptoms of psychosis, help with the delusions, help with the hallucinations, help that they're thinking more clearly, helping with the personal interactions so that individual isn't so wrapped up in their delusions that they're unable to deal with their attorney, deal with their family, deal with our correctional officers. They're able to rationalize that.

16

Are these delusions going to completely go away? No, likely not. But they're going to become less – they're not going to be in your face all the time. They're going to become less of an issue, and they're going to go into the background some where they aren't absolutely part of everything in regards to the defense. They may still be there, but they can say, okay, I'm – it's real, but that doesn't – that doesn't pertain to now. Let's talk about my case.

And that is really what we're looking at when we're treating individuals with antipsychotics in order to restore them to competency with schizophrenia individuals. The delusions may remain, but they aren't so much involved in their day-to-day and their case.

Doc. No. 166 at 105-06. Steffes was deemed competent on April 8, 2004, but it is unclear what his medications and dosages were at that time. Doc. No. 160-9 at 4.

As for fluphenazine, Steffes points to records demonstrating he continued having paranoid ideations regarding a neighbor while on this medication. *See* Doc. No. 156-16. However, this record also indicates that his hallucinations were relieved while on this medication. *Id.* Based on the explanation provided by Dr. Sarrazin above, an individual may be deemed competent while still retaining some of the symptoms of schizophrenia. I find no error with Judge Mahoney's findings that risperidone and fluphenazine were generally successful for Steffes in the past and that under the first part of the second *Sell* requirement, involuntary medication with these drugs is substantially likely to restore Steffes' competency. This objection is overruled.

### 2. *Whether Involuntary Medication is Substantially Likely to Cause Side Effects That Would Interfere with Trial*

Similar to the above objection, Steffes argues that Judge Mahoney erred by concluding that the side effects of risperidone and fluphenazine were well-managed. Steffes points out that fluphenazine is a first-generation antipsychotic, like haloperidol, which caused Steffes severe side effects in the past. He also cites medical records stating

that he appeared "disheveled," "restless and uncomfortable," and had "some difficulty with concentration" while on fluphenazine. Steffes also had "some problems with 'air headedness' where he forgot what he was doing or forgot what he was concentrating on" while on this drug. Doc. No. 171 at 6 (citing Doc. No. 156-15 at 2).

There is no evidence in the record that doctors attributed the negative side effects from haloperidol to fluphenazine as well. Dr. Sarrazin testified that Steffes appeared to do fairly well with the treatment of fluphenazine. Doc. No. 166 at 73. With regard to the other side effects Steffes mentions, those are contained within a treatment note dated November 12, 2008. Doc. No. 156-15 at 1. At that time, Steffes was seeking a provider to manage his fluphenazine medication. *Id.* That provider recommended that Steffes continue the medication at the current dosage, but that he should be seen on a three to four-month medication evaluation regimen. *Id.* at 2. Therefore, it appears his dosage may have required adjustments at this time. Judge Mahoney's finding that fluphenazine did not pose a risk of side effects to render its administration medically inappropriate is supported by the record as a whole.

With regard to the risperidone, Steffes states that his previous side effects included slurred speech, unsteady walk, excessive sleep and drooling. *See* Doc. No. 166 at 100; Doc. No. 156-1. He also struggled with "psychomotor retardation" and "paucity of speech" while on this drug. *See* Doc. No. 156-7. He would feel "stiff, wooden" at times and "depressed" with feelings of worthlessness. *See* Doc. No. 156-6. Steffes testified that he felt "fidgety" on this medication and would drool. *See* Doc. No. 166 at 113.

Steffes' treatment with risperidone, or Risperdal, has been complicated. He experienced side effects of slurred speech, unsteady walk, excessive sleep and drooling in December 2001 when he was on six milligrams of Risperdal and on Haldol. *Id.* His Risperdal medication was reduced to alleviate those side effects. *Id.* When those symptoms did not improve, his Haldol was removed from his medication regimen and

18

Risperdal was further reduced. Doc. No. 156-2. Risperdal was then reduced to one milligram alternating with a half milligram in 2002. Doc. No. 166 at 101-02; Doc. No. 156-6. By February 2002, he was not experiencing any significant side effects. Doc. No. 156-7. Dr. Sarrazin testified that after 2003 when the Haldol had been removed, Steffes "handled" up to 16 milligrams of Risperdal. Doc. No. 166 at 104-05. He was later deemed competent in April 2004, after Risperdal had been reduced to eight milligrams per day in October 2003. *See* Doc. Nos. 156-13; 160-9 at 4. It is unclear what dosage of Risperdal he was taking when he was deemed competent in April 2004.

Judge Mahoney credited Steffes' testimony that he was fidgety and drooling while on 15 milligrams of Risperdal per day, noting that the record demonstrated his dosage was reduced from 16 to eight milligrams a day after he left the Medical Center. Doc. No. 170 at 19 (citing Doc. No. 156-13). While taking eight milligrams a day, Steffes reported feeling "great" and was pleased with this dosage. Doc. No. 156-13 at 1.

Taking all of this evidence into account, Judge Mahoney found that the Government had not established the medical appropriateness of 15 milligrams daily dosage of risperidone due to the side effects he experienced at that dosage. Doc. No. 170 at 19-20. Because the Government presented only evidence related to the oral form and not the long-acting injection form, Judge Mahoney found that the maximum dosage for the long-acting injection form would also be inappropriate. *Id.* Based on FDA dosage information, she concluded that the "usual dosage" of 25 milligrams of risperidone every two weeks was medically appropriate if Steffes first tolerated an oral course of risperidone and then began to refuse treatment. *Id.* While Judge Mahoney addressed the negative side effects associated with high dosages of risperidone under the fourth *Sell* requirement, rather than the second, the result is the same. At high dosages, the second *Sell* requirement is not met as to risperidone. However, it is met when the drug is administered at lower dosages, which is what Judge Mahoney recommends. Therefore, I find the record supports Judge Mahoney's finding that the side effects associated with

19

risperidone can be effectively managed to restore Steffes' competency if given at a lower dosage. This objection is overruled.

## C.    The Third _Sell_ Requirement

The third _Sell_ factor requires the Government to prove "that any alternative, less intrusive treatments are unlikely to achieve substantially the same results" and that "less intrusive means for administering the drugs, _e.g._, a court order to the defendant backed by the contempt power," are unavailable. _Sell_, 539 U.S. at 181. Steffes argues that because the third _Sell_ factor assumes the Government has established the second factor (which Steffes argues it has not), the third factor fails as well. He makes no other objection to the R&R findings with regard to this requirement. This objection is overruled based on my analysis of the second _Sell_ factor.

## D.    The Fourth _Sell_ Requirement

The fourth _Sell_ factor requires the Government to prove "that administration of the drugs is _medically appropriate, i.e._, in the patient's best medical interest in light of his medical condition." _Id._ (emphasis in original). With regard to this factor, Steffes argues the court cannot sua sponte change the proposed treatment plan to provide for a lower dosage because it is the Government's burden to show by clear and convincing evidence that a particular treatment plan is medically appropriate.

Judge Mahoney noted that the Government's proposed treatment plan failed to set forth the maximum daily dosages of risperidone and aripiprazole in the form of long-acting injections, the proposed method of involuntary medication if Steffes first tolerates the daily oral form. Judge Mahoney noted that the Fourth Circuit Court of Appeals has held that the Government must set forth the maximum dosage for each medication in the proposed treatment plan to satisfy the fourth _Sell_ requirement. Doc. No. 170 at 20 (citing _United States v. Evans_, 404 F.3d 227, 241-42 (4th Cir. 2005)). Similarly, the Ninth and

20

Tenth Circuits have held that the court must include this information in its *Sell* order. *Id.* (citing *United States v. Hernandez-Vasquez*, 513 F.3d 908, 916-17 (9th Cir. 2008) and *United States v. Chavez*, 734 F.3d 1247, 1253 (10th Cir. 2013)).

Relying on Wolter's Kluwer "Drug Facts and Comparisons," Judge Mahoney noted the maximum FDA-approved dosage of risperidone is 50 milligrams every two weeks, while the usual dosage is 25 milligrams every two weeks. *See* Doc. No. 170 at 20 (citing Wolter's Kluwer, RisperiDONE Injection, Drug Facts and Comparisons (last updated March 16, 2017), http://fco.factsandcomparisons.com/lco/action/doc/retrieve/ docid/fc_dfc/5549354 (subscription required)). There is no well-established maximum dosage for aripiprazole, but the usual dosage to treat schizophrenia is 300 to 400 milligrams injected monthly. *Id.* at 21 (citing Wolter's Kluwer, ARIPiprazole Injection, Drug Facts and Comparisons (last updated May 3, 2017), http://fco.factsandcomparisons.com/lco/action/doc/retrieve/docid/fc_dfc/5549342 (subscription required)). Based on this information, Judge Mahoney concluded that if Steffes tolerated an oral course of risperidone but then began to refuse treatment, the involuntary administration of 25 milligrams of risperidone every two weeks was unlikely to cause side effects and was thus medically appropriate. *Id.* at 20. She also concluded that the involuntary administration of aripiprazole was medically appropriate, as long as no more than 400 milligrams were administered every four weeks. Like risperidone, aripiprazole could not be administered as a long-acting injection unless Steffes first tolerated a course of daily oral dosages. *Id.* at 21.

I find no error with regard to this aspect of the R&R. Judge Mahoney's recommended modifications to the Government's proposed treatment plan are more restrictive and based on more complete information. *See* Doc. No. 160-3. The additional restrictions imposed on the long-acting injections are consistent with (or less than) the proposed daily doses listed in the proposed treatment plan. *See* Doc. No. 160-3. Moreover, the proposed treatment plan (as it stands) provides that the long-acting form

21

of risperidone (Consta) and aripiprazole (Abilify Maintena) would be used only if Steffes first tolerated oral doses of these medications. *See* Doc. No. 160-3 at 2. If he will not take medication voluntarily, then the proposed treatment plan provides that treatment would start with the long-acting form of fluphenazine, rather than risperidone or aripiprazole.[2] *Id.* at 2-3.

In short, I agree with Judge Mahoney that the Government's proposed treatment plan, with her recommended modifications, is medically appropriate.

## V.    CONCLUSION

For the reasons set forth herein:

1.    I **accept** Judge Mahoney's June 6, 2017, report and recommendation without modification (Doc. No. 170). *See* 28 U.S.C. § 636(b)(1).

2.    Pursuant to Judge Mahoney's recommendation, the Government's motion (Doc. No. 143) to extend Steffes' commitment under 18 U.S.C. § 4241(d)(2)(A) and involuntarily administer antipsychotic medications to Steffes is **granted**.

3.    The Government may proceed with the proposed treatment plan (Doc. No. 160-3), with the following modifications:

(a)    haloperidol is not to be involuntarily administered as the side effects from that medication are substantially likely to interfere with any trial;

---

[2] This is inconsistent with Dr. Sarrazin's testimony. *See* Doc. No. 166 ("So the long-acting injectables that we have available to us would be the fluphenazine, the Prolixin, which he's been on, plus we have the short-acting injectable; the risperidone Consta, which he's been on previously the oral, so we know he will tolerate that, we can go there; or the paliperidone, Sustenna, which because he's been on the risperidone, he's had exposure to that particular medication."). Judge Mahoney credited the more restrictive approach contained in the proposed treatment plan over Dr. Sarrazin's testimony. *See* Doc. No. 170 at 12, n.2. I agree with this decision.

(b)     the involuntary administration of risperidone and aripiprazole may not be administered in injection form unless Steffes has first tolerated an oral course of those drugs;

(c)     the involuntary administration of risperidone through long-acting injection may not exceed a dosage of 25 milligrams every two weeks;

(d)     the involuntary administration of aripiprazole through long-acting injection may not exceed a dosage of 400 milligrams every four weeks and

(e)     the involuntary administration of fluphenazine through long-acting injection must fall within the dosage range of 12.5 milligrams to 100 milligrams every two, three, or four weeks.

4.      Prior to each forced administration of medication, staff should first request that Steffes take the medication voluntarily.

5.      Pursuant to 18 U.S.C. § 4241(d)(2)(A), Steffes shall be committed for an additional reasonable period of time, not to exceed seven (7) months from the date of this order.

6.      After Steffes has been committed for five (5) months following the date of this order (or sooner, if his competency has been restored), the Medical Center shall file a status report with the court detailing Steffes' treatment thus far, including whether Steffes' symptoms have improved, whether he has suffered from any side effects and whether and when his competency is likely to be restored.

**IT IS SO ORDERED.**

**DATED** this 24th day of July, 2017.

_____
Leonard T. Strand, Chief Judge